Chad S. Pehrson (12622)
Clayton Hadlock (18397)
**KUNZLER BEAN & ADAMSON**
50 W Broadway, Suite 1000
Salt Lake City, UT 84101
Telephone: (801) 994-4646
cpehrson@kba.law
chadlock@kba.law

*Attorneys for Plaintiff Alucent Biomedical, Inc.*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ALUCENT BIOMEDICAL, INC.,<br><br>                           Plaintiff,<br><br>v.<br><br>CLINICAL SERVICES CORPORATE OPERATIONS, INC. (doing business as "ALLUCENT"),<br><br>                           Defendant. | CASE NO.: 2:23-cv-00445-HCN<br><br>**PLAINTIFF ALUCENT'S MOTION FOR PRELIMINARY INJUNCTION ENJOINING DEFENDANT ALLUCENT FROM CONTINUED TRADEMARK INFRINGEMENT**<br><br>Judge Howard C. Nielson, Jr. |

Pursuant to Fed. R. Civ. P. 65 and 15 U.S.C. § 1116, Plaintiff Alucent Biomedical, Inc. ("Alucent") requests that the Court enter a preliminary injunction enjoining Defendant Clinical Services Corporate Operations, Inc. (doing business as "Allucent") from infringing Plaintiff Alucent's trademarks.

1

I.  INTRODUCTION

Plaintiff Alucent and Defendant Allucent operate in the same industry.  Plaintiff Alucent works to produce novel medical therapies for vascular health. Defendant Allucent advertises its mission is to "bring next-generation therapies to light."[1]  Plaintiff Alucent's name refers to *light*, which plays a key role in its vascular therapies; so does Defendant Allucent's name.

The confusion here is obvious.  And Plaintiff Alucent has priority of use, having operated under the "Alucent" name for many years.  In contrast, Defendant Allucent rebranded last year, after having previously operated under the name CATO SMS. Unfortunately, the re-brand effort failed to pick an available mark for use within the biomedical development industry; instead, Defendant Allucent took Alucent's name, added an *l*, and announced to the world that it would henceforth be known as "Allucent."[2]

Defendant Allucent then applied for federal trademarks under its new name, ignoring that Plaintiff Alucent has long used its name in commerce and further held registered trademarks. Defendant Allucent trumpets on its website today that its "new name" and "bold branding" will lead it to new commercial heights.[3]

Put simply, this "rebranding" violates Plaintiff Alucent's trademark rights. Plaintiff Alucent has used the name Alucent in commerce for many years, and registered trademarks for ALUCENT BIOMEDICAL in 2018.  Of course, the Lanham Act protects Plaintiff Alucent's marks from infringement by junior users like Defendant Allucent. Last month, upon learning of

---

[1] *See* "CATO SMS is Now Allucent," *available at* CATO SMS is Now Allucent | Allucent (June 27, 2023).
[2] *Id.*
[3] *Id.*

2

Defendant Allucent's infringement, Plaintiff Alucent demanded that Defendant Allucent stop using its confusingly similar name. Defendant Allucent refused. Thus, Plaintiff Alucent had no choice but to bring this lawsuit and now seeks a preliminary injunction forbidding Allucent from continued infringement.

In this situation, Plaintiff Alucent meets the requirements for preliminary injunctive relief: it is likely to succeed on the merits, it will suffer irreparable harm if preliminary relief is not granted, the equities tip in its favor, and an injunction is in the public interest. So, the Court should grant the motion and preserve Plaintiff Alucent's rights under federal law pending further litigation.

## II.     FACTUAL BACKGROUND

Plaintiff Alucent is a biomedical company focused on a vision of transforming the way vascular[4] disease is treated. (Compl. ¶¶ 8-9; Decl. of Myles Greenberg ¶ 2.) Alucent's first-of-its-kind technology uses *light*; a light source photoactivates a molecule compound that can create durable links within a blood vessel's native connective tissue. (*Id.*) This critical use of light led the company to select the name "Alucent," and Alucent describes its processes as "lighting the way to sustainable patency." (*Id.*)

Alucent became a standalone company in 2017. (*Id.*) As early as 2017, Plaintiff Alucent began using the name Alucent in commerce to identify and describe its products and services, and their source (the "Alucent Marks").  In January 2018, Alucent filed for two trademark registrations. Alucent's registrations were Registration No. 5535737, which protects the word

---

[4] "Vascular" disease refers to disease of the blood vessels.

3

mark "ALUCENT BIOMEDICAL," and Registration No. 5544706, which protects Alucent's logo:



Alucent's trademark applications were successful. On August 7 and August 21, 2018, respectively, the PTO granted the registrations on the Principal Register. (Compl. ¶ 9; Greenberg Decl. ¶ 7). Alucent has used the Alucent Marks continuously since the company's creation, and the Alucent Marks have become associated with Alucent. (Compl. ¶ 9; Greenberg Decl. ¶ 3.).

Allucent says it is a global provider of comprehensive drug development solutions, including consulting, clinical operations, biometrics, and clinical pharmacology across a variety of therapeutic areas. Greenberg Decl. ¶¶ 12; 15.  Allucent purports to have a therapeutic specialty in "cardiology and vascular" medicine. (*Id.*)

Until recently, Allucent was known as CATO SMS. (Compl. ¶¶ 17-31; Greenberg Decl. ¶ 12.) In 2022, it rebranded itself as "Allucent" to use its "new name and bold branding" to "put[] the spotlight on biotech innovators and help[] them deliver treatments to patients with unmet needs." (*Id.*) Allucent says its name "means to shine a light upon something or to create an opportunity." (*Id.*)

Without Alucent's authorization, Allucent adopted and began using its new name and various associated marks, without regard for the consumer confusion that was certain to result

given the proximity of Alucent and Allucent's businesses and the essential identity between their names. (Compl. ¶¶ 17-31; Greenberg Decl. ¶¶ 9-10). Defendant Allucent even applied for eight federal trademarks under its new name. (*Id.*)

In 2023, soon after learning of Defendant Allucent's infringement, Plaintiff Alucent sent Allucent a cease-and-desist letter objecting to the infringement. (Greenberg Decl. ¶ 10). Defendant Allucent's response was simple: we will continue to use Allucent. (Greenberg Decl. ¶ 11).

### III.  LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

The trademark laws specifically authorize the granting of injunctive relief. Courts "may grant injunctive relief to the owner of a registered trademark whose rights to that mark have been infringed on by another's use of a copy or colorable imitation that is likely to cause confusion, or to cause mistake, or to deceive." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463 (4th Cir. 1996) (citing 15 U.S.C. § 1114(1)). To obtain preliminary injunctive relief, a Lanham Act plaintiff need not show infringement – only that it is "likely to succeed" on the merits of its infringement case. *See Equitable Nat. Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1239, 1252 (D. Utah 2020). It must also show that it is "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest." *Winter*, 555 U.S. at 20.  Alucent can make each of these showings, and it is therefore entitled to preliminary relief.

IV.     ARGUMENT

    A. **Plaintiff Alucent Is Likely To Succeed On The Merits**

A Lanham Act plaintiff is likely to succeed on the merits if it can show that (1) It has a protectable mark; (2) the defendant's use of plaintiff's trademark in connection with goods or services creates a likelihood of confusion. *Equitable Nat. Life Ins. Co.*, 434 F. Supp. 3d at 1239 (citations omitted). When performing this analysis, "the central inquiry is the likelihood of consumer confusion." *Id.* at 1239–40 (citation and internal quotation marks omitted).

    1. **Ownership Of A Valid Trademark**

Plaintiff Alucent is the owner of all rights in and to the Alucent Marks, some of which are registered on the Principal Register and are used in connection with Alucent's goods and services.  The Lanham Act creates a statutory presumption of protectability for registered marks. *See* 15 U.S.C. § 1115(a) (registration "shall be prima facie evidence of the validity of the registered mark, . . . of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce . . ."). Indeed, "[t]he owner of a mark on the principal register enjoys valuable benefits, including a presumption that the mark is valid." *United States Patent and Trademark Office v. Booking.com B.V.*, 140 S. Ct. 2298, 2302 (2020) (citation and internal quotation marks omitted); *see also 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013) (stating that "the registration of a mark serves as prima facie evidence of both the mark's validity and the registrant's exclusive right to use it in commerce").  Plaintiff Alucent is therefore likely to succeed in showing that the Alucent Marks

are valid and that it owns them. *See Harris Research, Inc. v. Lydon*, 505 F. Supp. 2d 1161, 1166–69 (D. Utah 2007) (plaintiff demonstrated likelihood of success on ownership element where marks were registered).

2. **Likelihood Of Consumer Confusion**

In the Tenth Circuit, courts examine six factors when determining whether a likelihood of confusion exists for the purposes of a trademark infringement claim. These factors include:

(1) The degree of similarity between the marks, including the marks' appearance, pronunciation, suggestion, and manner of display;
(2) The strength or weakness of the plaintiff's mark;
(3) The intent of the alleged infringer in adopting its mark;
(4) The similarities and differences of the parties' goods, services, and marketing strategies;
(5) The degree of care likely to be exercised by purchasers of the goods or services involved; and
(6) Evidence of actual confusion.

*M Welles and Assocs., Inc. v. Edwell, Inc.*, 69 F. 4th 723, 730 (10th Cir. 2023). These factors are "not an exhaustive list, and no one factor is dispositive." *Id*. Rather, the "importance of any particular factor in a specific case can depend on a variety of circumstances, including the force of another factor." *Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1072 (10th Cir. 2023). In this case, to the extent each of the six factors is relevant, it supports Alucent, which is therefore likely to show a likelihood of confusion.

a. **Degree of Similarity Between Marks:** *Allucent Essentially Identical to Alucent*

The first factor – the similarity of the marks themselves – heavily favors Plaintiff Alucent.[5] "To assess similarity, we consider each mark's sight, sound, and meaning." *Elevate*

---

[5] "The similarity of the marks has always been considered a critical question in the likelihood-of-confusion analysis." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d

*Fed. Credit Union*, 67 F.4th at 1076. The court "give[s] greater weight to the similarities than to the differences" and "examine[s] the mark as a whole[.]" *Id*. This analysis includes examination of "appearance, pronunciation of words used, verbal translation of the pictures or designs involved, and suggestion." *Kodiak Cakes LLC v. Continental Mills, Inc.*, 358 F. Supp. 3d 1219, 1230 (D. Utah 2019) (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986)).

Here, the dominant portions of the marks in question – "Alucent" and "Allucent" – are not just similar, but virtually identical, differentiated only by a single unpronounced *l*. They look nearly the same and – critically – sound *exactly* the same. How marks sound is particularly important "because reputation is often conveyed word-of-mouth." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 352 (9th Cir. 1979). Indeed, when the "dominant portions of two marks sound the same when spoken by consumers, there is likely to be confusion," and "[a]ny differences in the design of the marks does not dispel this confusion." *Blumenfeld Dev. v. Carnival Cruise Lines*, 669 F. Supp. 1297, 1320 (E.D. Pa. 1987); *see also Mayson-Dixon Strategic v. Mason-Dixon Polling*, 324 F. Supp. 3d 569, 579 (D. Md. 2018) (granting preliminary injunction where the marks were "virtually identical, set apart by only one silent consonant"); *Palantir Techs. Inc. v. Palantir.net, Inc.*, 85 U.S.P.Q.2d 1764, 1768 (N.D. Cal. 2008) ("The marks are identical. They sound the same and have the same meaning. While the fonts used by the companies are different, this distinction is meaningless, especially since these companies are essentially marketing services, not goods."). For this reason, courts routinely find a likelihood of confusion where

---

1025, 1032 (9th Cir. 2010); *see also Daddy's Junky Music v. Big Daddy's Family Music*, 109 F.3d 275, 283 (6th Cir. 1997) ("Similarity of marks is a factor of considerable weight.").

marks are homophonous or homonymous. *See, e.g.*, *Coryn Grp. II, LLC v. OC Seacrets, Inc.*, 868 F. Supp. 2d 468, 486 (D. Md. 2012) ("SECRETS" and "SEACRETS"); *In re Viterra Inc.*, 671 F.3d 1358, 1367 (Fed. Cir. 2012) ("XCEED" and "X-Seed"); *Travelers Indem. Co. v. Travellers.com*, Civ. No. 10-cv-448 (E.D. Va. Nov. 28, 2011) ("TRAVELERS" and "TRAVELLERS"); *Alliance Bank v. New Century Bank*, 742 F. Supp. 2d 532, 538-39 ("CUSTOMER FIRST" and "CUSTOMERS 1ST"); *Boigris v. ECW P&T, LLC*, 7 F.4th 1079, 1088 (11th Cir. 2021) ("European Wax Center" and "euwaxcenter.com"); *dmarcian, Inc. v. dmarcian Europe BV*, 60 F.4th 119, 140 (4th Cir. 2023) ("homonymous companies").

      **b. The Strength or Distinctiveness of the Alucent Marks:** *Alucent's Mark Presents the Highest Possible Strength*

The second factor is the strength or distinctiveness of the plaintiff's mark. The strength of a mark is important to the likelihood-of-confusion because "the stronger the trademark, the more likely that encroachment upon it will lead to confusion." *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019) (cleaned up) (citation omitted). Trademarks that have been registered on the Principal Register enjoy a presumption of distinctiveness, especially where – as here – the marks were registered without evidence of secondary meaning. *See, e.g.*, *KMMentor, LLC v. Knowledge Mgmt. Prof. Soc., Inc.*, 712 F. Supp. 2d 1222, 1245 (D. Kansas 2010). Therefore, the Alucent Marks are presumptively distinctive and the second factor favors Alucent.

Even if this presumption did not apply, the Alucent Marks are exceptionally strong on their own terms. Courts sort trademarks into five buckets based on the marks' strength or distinctiveness; from weakest to strongest, these buckets are (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *Elevate Fed. Credit Union v. Elevations Credit*

*Union*, 67 F.4th 1058, 1074 (10th Cir. 2023). A fanciful mark – the strongest type – "is a novel word or design that has been coined for the sole purpose of serving as a trademark (as in Kodak or Exxon) *Id.* 1074 n.7. The Alucent Marks are fanciful marks and therefore possess the highest level of conceptual strength. Indeed, "[b]ecause fanciful marks are the strongest marks," whenever fanciful marks are at issue, the first factor "weighs in favor of the plaintiff." *Covantage Credit Union v. Blue Cross Blue Shield of Mich. Mut. Ins. Co.*, Case No. 21-12559 (E.D. Mich. Mar. 16, 2022). This is true even when the mark in question is less distinctive than "Alucent." *See, e.g.*, *id.* ("COVANTAGE"); *Maaco Franchising, LLC v. Boensch*, Civ. Action NO. 3:16-cv-155-GCM (W.D.N.C. Sept. 12, 2016) ("Maaco"); *Johnson & Johnson Consumer Cos., Inc. v. Aini*, 540 F. Supp. 2d 374, 390 (E.D.N.Y. 2008) ("AMBI"); *DC Comics v. Towle*, 989 F. Supp. 2d 948, 959 (C.D. Cal. 2013) ("BATMAN" and "BATMOBILE"); *Personeta, Inc. v. Persona Software*, 418 F. Supp. 2d 1013, 1018 (N.D. Ill. 2005) ("Personeta"); *Davinci Tech. Corp. v. Rubino*, Civ. No. 05-1561 (D.N.J. May 25, 2005) ("DaVinciTek"); *Gennie Shifter, LLC v. Lokar, Inc.*, Civ. Action No. 07-cv-01121 (D. Colo. Jan. 12, 2010) ("Lokar").[6]

      **c. The Intent of the Alleged Infringer:** *Inference of Malintent Given Same Industry, Same Name, and Sophisticated Re-branding Approach*

The third factor – the defendant's intent – examines "[e]vidence that the alleged infringer chose a mark with the intent to copy, rather than randomly or by accident[.]" *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1004 (10th Cir. 2014) (citations and internal quotation marks

---

[6] At trial, both a mark's "conceptual strength" and its "commercial strength" can be relevant. *See, e.g.*, *Elevate Fed. Credit Union*, 67 F.4th at 1074. The Alucent Marks are commercially strong, but commercial strength is "an evidence-intensive inquiry," and therefore, district courts may "properly decline[]" to consider commercial strength "at the preliminary injunctive stage." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011).

omitted). The presence of such evidence "typically supports an inference of likelihood of confusion." *Id*. The Tenth Circuit applies this factor with some important background context: "[o]ne who adopts a mark similar to another already established in the marketplace does so at his own peril because the court presumes that he can accomplish his purpose: that is, that the public will be deceived. All doubts must be resolved against him." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983) (citations and internal quotation marks omitted).

"The proper focus under this factor is whether the defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1091 (10th Cir. 1999) (citation and internal quotation marks omitted). "Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 973 (10th Cir. 2002).

Here, it appears self-evident that Defendant Allucent deliberately intended to infringe the Alucent Marks and cause consumer confusion. The names are nearly identical and used for businesses operating within the same industry. Furthermore, Defendant Allucent retained outside trademark counsel to apply for several registrations at the time of its re-brand. In other words, this is not a case where the defendant can reasonably claim ignorance of the plaintiff's trademarks, or lack of sophistication with respect to the trademark registration process. Defendant Allucent invested in trademark research and applications for registration, and retained qualified counsel to help it do so.

Indeed, Defendant Allucent filed for its first trademark for the name "ALLUCENT" on March 17, 2022 – several weeks before it announced its rebranding. *Compare* Trademark

11

Application Serial No. 97318066 with May 2, 2022 Press Release "CATO SMS is Now Allucent." (both documents are attached within Exhibits B and C of the Greenberg Declaration). During this process, Allucent would have inevitably learned that another biomedical company had been operating for years under a homophonic name and had its own registered trademarks. Defendant Allucent's decision to rebrand under the Defendant Allucent name anyway, and then to file its own trademark registration applications, demonstrates that Allucent intended to infringe, and therefore supports a likelihood of confusion. *See, e.g.*, *Beer Nuts*, 711 F.2d at 941 ("One who adopts a mark similar to another already established in the marketplace does so at his peril, because the court presumes that he can accomplish his purpose: that is, that the public will be deceived. All doubts must be resolved against him.") (cleaned up); *Mayson-Dixon Strategic v. Mayson-Dixon Polling*, 324 F. Supp. 3d 569, 579 (D. Md. 2018) ("Mayson disregarded Mason-Dixon's trademark registration by commencing operations under an almost identical service mark for identical services, evidencing Mayson's intent to confuse the public."); *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir. 1990) ("When a newcomer to the market copies a competitor's trade dress, its intent must be to benefit from the goodwill of the competitor's consumers . . . ."); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 466 (4th Cir. 1996) ("[W]e presume that the person who sets out to infringe on another's trademark has more brains than scruples, and will likely succeed.")

Defendant Allucent's continued business activities despite Plaintiff Alucent's express notification of infringement also supports an inference of intent. *See*, *e.g.*, *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 937 (4th Cir. 1995) (alleged infringer's

opening of new location after demand to change names supported "a presumption that [the defendant] acted in bad faith").

### d. Similarity of Goods, Services, and Marketing Strategies: *Same Industry and Same "Mission" Shows Proximity and Relatedness*

The fourth factor – the similarity of the parties' goods, services, and marketing strategies– favors a Lanham Act plaintiff whenever the goods or services offered by the plaintiff and defendant are related or when the two operate in the same industry. *See Clinton Detergent Co. v. Proctor & Gamble Co.*, 302 F.2d 745, 748–49 (C.C.P.A. 1962) (explaining that dish detergent and a car cleaner, although intended for different purposes, were sufficiently related to create a likelihood of confusion). "This factor is typically analyzed by separately considering (1) the similarity of products and (2) the similarity in how the products are marketed." *Equitable Nat. Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1250 (D. Utah 2020). Products "need not be identical" for the factor to weigh in favor of plaintiffs; rather, "substantial similarity between products" is sufficient. *Id*.

Indeed, both the Second and Fourth Circuits have suggested that this factor is met unless the two products are "so foreign . . . as to insure against any identification of the two" is this factor not met. *Pizzeria Uno v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984) (quoting *Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928)).

In this case, the similarities between the products and services of Plaintiff Alucent and Defendant Allucent create a strong likelihood of confusion. Plaintiff Alucent is a biotechnology company in the business of developing therapies to treat vascular disease. Defendant Allucent is also a biotechnology company that – in its own words – is a "global provider of comprehensive drug development solutions" "on a mission to bring new therapies to light," including in the

13

"cardiology and vascular" specialty. That is to say, both Plaintiff Alucent and Defendant Allucent operate in the same industry – the biomedical industry – and expressly advertise themselves as trying to solve the same problem. Thus, this factor favors Alucent.[7]

This factor also includes consideration of the similarity between the marketing strategies used by the markholders. This consideration supports Plaintiff Alucent's position, since Plaintiff Alucent and Defendant Allucent operate and advertise in the same trade and advertising channels. For instance, both appear at common trade conferences. In addition, both advertise in similar mediums, including the internet, with nearly identical domain names. *Compare* www.alucentbiomedical.com and alucentmedical.com *with* www.allucent.com). When evaluating this factor in relation to marketing using the internet, courts typically examine "(1) whether both parties use the Internet as a substantial marketing and advertising channel, (2) whether the parties' marks are utilized in conjunction with Internet-based products, and (3) whether the parties' marketing channels overlap in any other way." *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1331 (D. Kansas 2005).

---

[7] The fact that Plaintiff Alucent is working to produce medical therapies, and Defendant Allucent purports to assist other biotechnology companies in producing medical therapies, does not mean the two companies' products and services are not related. *See Equitable Nat. Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1250 (D. Utah 2020) (holding that fixed annuities and variable annuities are sufficiently similar to meet this factor). Here, reasonable consumers – especially those *talking* about Alucent and Allucent – would be expected to understand that the two companies' products and services are related, because both operate in the same industry and have the same name. *See, e.g., Brookfield Comms. V. W. Coast Ent'm't Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999) (similarity-of-products factor favored plaintiff where "both companies offer[ed] products and services relating to the entertainment industry generally"); *Palantir,* 85 U.S.P.Q.2d at 1768 ("Here, both companies offer products and services relating to the computer software industry generally . . . .").

In this case, both Plaintiff Alucent and Defendant Allucent use the internet to market their products; thus, a consumer, potential research partner or potential employee familiar with Alucent hoping to find its website might easily reach Defendant Allucent's website: www.allucent.com. This risk is heightened because Allucent selected a name that is pronounced the same as Alucent's and differs in spelling by a single non-enunciated letter, such that a consumer who knows Alucent's name primarily by sound – or, understandably, cannot remember whether it has one *l* or two – will find themselves on Allucent's website. And, as established above, the parties' marketing channels overlap in other ways; for example, at conferences they both attend. Therefore, Alucent and Allucent share the same marketing channels, which satisfies the fourth factor.

    e.  **Purchasers' Degree of Care—*Limited Application.***

The fifth factor – the purchasers' degree of care – has limited application here. However, to the extent the factor does have any application here, it favors Alucent. First, Alucent's products and services are high-quality: it has devoted immense resources to developing novel and promising treatments for vascular disease, including peripheral artery disease and for arteriovenous fistula maturatio.  Such efforts are resource intensive, and involve numerous activities around the country including research activities, joint research activities with various commercial partners, clinical trials, human trials, marketing, fundraising, and advertising. Alucent therefore has years of promising progress under its belt, and it has much to lose by being confused with Allucent.

Second, both Plaintiff Alucent and Defendant Allucent advertise themselves to the general public. Plaintiff Alucent, for instance, hopes to reach (1) highly capable employees to

15

advance its drug development mission; (2) people with vascular disease, (3) doctors, (4) potential investors, (5) potential employees, and (6) other drug companies. Defendant Allucent aims to reach these same categories of people, as shown by the text of the following published press releases:

(1) Soliciting individuals to enroll in a clinical trial for a COVID-19 vaccine;[8]

(2) Announcing to potential employees that it has been "Great Place to Work® Certified™ in India";[9]

(3) Promoting key hires or internal promotions;[10] and

(4) Broadly celebrating its name.[11]

### f. Actual Confusion—*Unnecessary at PI Stage*

Although actual confusion is "often the best evidence of likelihood of confusion," "[a] plaintiff need not set for evidence of actual confusion to prevail in a trademark infringement action." *Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1082 (10th Cir. 2023) (citation and internal quotation marks omitted). This is particularly true at the preliminary injunction stage, where a plaintiff need only show he is likely to show a likelihood of confusion. *See Trial Lawyers College v. Gerry Spence Trial Lawyers College at Thunderhead Ranch*, 23

---

[8] *See* "Pharm-Olam Enrolling UK Volunteers for Phase 3 Valneva COVID-19 Vaccine Study," *available at* Pharm-Olam Enrolling UK Volunteers for Phase 3 Valneva COVID-19 Vaccine Study | Allucent (accessed June 26, 2023).
[9] *See* "Allucent Is Now Great Place To Work Certified," *available at* Allucent Is Now Great Place To Work Certified | Allucent (accessed June 26, 2023).
[10] *See, e.g.*, "Allucent Appoints Alexander J. MacDonald as Vice President of Model-Informed Drug Development," *available at* Allucent Appoints Alexander J. MacDonald as Vice President of Model-Informed Drug Development | Allucent (accessed June 26, 2023).
[11] *See* "CATO SMS is Now Allucent," *available at* CATO SMS is Now Allucent | Allucent (accessed June 26, 2023).

F.4th 1262, 1273 (10th Cir. 2022) ("Even without actual confusion, the likelihood of confusion could contribute to a finding of irreparable injury.")

### B. Plaintiff Alucent Will Suffer Irreparable Harm Absent Preliminary Relief

"There are few things in our commercial life more valuable than a company's reputation, goodwill, and trademarks." *By-Rite Distributing, Inc. v. Coca-Cola Co.*, 577 F. Supp. 530, 541 (D. Utah 1983). A plaintiff seeking an injunction under Sections 1125(a), (c), or (d) of the Trademark Act "shall be entitled to a rebuttable presumption of irreparable harm upon a finding of . . . likelihood of success on the merits[.]" U.S.C. § 1116(a). Here, Plaintiff Alucent has shown that it is likely to show a likelihood of confusion, and it therefore stands at risk of irreparable harm.

The risk of irreparable harm is heightened in this case due to the particular business characteristics of the parties. Obtaining FDA approval for a drug-device such as Alucent's is high-stakes and high-cost. Clinical trials take years to design and conduct, and regulatory review takes years more.[12] This timeline and special nature of the industry increases the stakes and nature of the irreparable harm. Defendant Allucent of course is not a company with limited resources that just started up in 2022; rather, it re-branded in 2022. Thus, the mature life cycle of Defendant Allucent's business causes great impact from the confusion. *Cf. By-Rite Distributing*, 577 F. Supp. at 541 (holding that confusion as to the quality and sponsorship of the products sold and damage to the claimant's goodwill and reputation for high quality products "is, in itself,

---

[12] For instance, on average, drugs take more than 10 years to get from Phase I to regulatory approval. *See, e.g.*, About Bio et al., "Clinical Development Success Rates and Contributing Factors 2011 – 2020," *available at* ClinicalDevelopmentSuccessRates2011_2020.pdf (bio.org) (accessed June 26, 2023).

17

irreparable injury sufficient to support an injunction"); *Harris Research, Inc. v. Lydon*, 505 F. Supp. 2d 1161, 1168 (D. Utah 2007) (finding irreparable injury when plaintiff showed likelihood of confusion and expended substantial amounts of time, money, and resources in establishing the fame and quality of the trademark). Also, given the high stakes and high risk nature of this industry, if Defendant Allucent's active business promotes poor quality research or causes harm to patients, this would work particularly damaging reputational harm on Plaintiff Alucent. These threats make preliminary relief particularly appropriate in this case.

### C. The Balance Of The Equities Favors Plaintiff Alucent

The balance of the equities favors Plaintiff Alucent. First, for the reasons set forth above, absent an injunction, Alucent will suffer imminent and irreparable harm. Defendant Allucent, by contrast, "can continue to operate" its business "as long as it uses a different name and mark." *Mayson-Dixon Strategic v. Mason-Dixon Polling*, 324 F. Supp. 3d 569, 581 (D. Md. 2018). (It could even use its *prior* name and mark, which it abandoned so it could instead infringe the Alucent Marks.) Second, Defendant Allucent's "disregard for [Alucent's] existing trademark registration" when Allucent changed its name "further tips the equities scale" in Plaintiff Alucent's favor. *See id.*

### D. A Preliminary Injunction Benefits the Public Interest

Finally, a preliminary injunction is in the public interest. "Infringement and dilution of trademarks are inherently contrary to the public interest." *Harris Research, Inc. v. Lydon*, 505 F. Supp. 2d 1161, 1169 (D. Utah 2007) (citation omitted). For these reasons, "[w]eighing the public interest is often fairly routine," and when a plaintiff demonstrates a likelihood of success on the merits and irreparable injury, "it will almost always be the case that the public interest will favor

the plaintiff." *Kos Pharms. v. Andrx Corp.*, 369 F.3d 700, 730 (3d Cir. 2004). That is the case here, where a preliminary injunction will not only protect Alucent's intellectual property rights but also ensure that potential Alucent patients are not confused about the source of its drugs.

## V. CONCLUSION

The Motion should be granted.

DATED this 13th day of July, 2023.

                    **KUNZLER BEAN & ADAMSON**

                    /s Chad S. Pehrson
                    Chad S. Pehrson
                    *Attorneys for Plaintiff*
                    *Alucent Biomedical, Inc.*